## Lovings et al. v. Commonwealth.

May 17, 1949.

Thomas Waller for appellants.

A. E. Funk, Attorney General, and Zeb A. Stewart, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

Appellants jointly indicted on a charge of obtaining money or property by false pretense, KRS 434.050, were found guilty and each sentenced to imprisonment for two years. They seek reversal on the grounds that (1) the verdict is contrary to the law and evidence; (2) the court erred in overruling their motions for verdict of not guilty; (3) the court gave erroneous instructions, and failed to instruct on the whole law of the case.

In the descriptive portion of the unusually lengthy and involved indictment it was alleged, substantially, that the defendants obtained money from Mrs. Tom Williams by delivering to her a certain ''bogus and pre-

tended check in words and figures as follows: Winchester, Ky., May 1948, No. ———. Peoples State Bank '& Trust Co. Pay to the order of Wm. Smith $10.00 ——— dollars. For ———. James B. Sewell, and receiving money and property to the value of $10.00, representing that the check had been signed by James B. Sewell, and that James B. Sewell had on deposit sufficient money to pay said check, which statements were known by Ed Lovings and Talbert Lovings to be false, for the said pretended check was not a good check but was bogus and forged, and it was not signed by James B. Sewell, and the said bank would not pay it when presented for payment.''

The grounds for reversal require a more or less detailed recital of the evidence. Tom Williams and his wife operated a grocery store in Winchester. She said that about 7:00 p. m., in June 1948, two men whom she had never seen before ''came in and stood by the side of the door; they didn't look right to me. They asked for a two pound box of crackers and a pound of bologna. I gave them the crackers and bologna. They wanted me to cash this check, and I asked them to let me see it, and the one I understood to be Talbert handed me the check. I couldn't make out either one of the names, and asked them who the check was and they said 'J. B. Sewell.' I asked Tom if he knew him and he said he did, and I cashed the check. Of course, the check looked peculiar; when they went out we looked at it and it was dated wrong.'' She said the purchase amounted to $1.13 and she gave Ed the difference. On cross-examination witness said, ''I didn't want to take the check, but I would rather give them the $10 than to keep them in there; I was afraid of them.''

The husband relates the transaction in about the same way as did his wife. He knew both the boys; he did not see the check until after the two left, and then his wife asked him if he knew Mr. Sewell, and he told her he thought he was the one who ran the barber shop across the street. He later presented the check for payment, and it was not paid. ''The young lady wrote this on it right there,'' (pointing to the check). On inspection the check shows the word ''Signature'' which might indicate that the teller was unable to make it out. Witness on the night of the transaction took the check

to police officers, and they located defendants in a restaurant, and when he identified them the officer took them to the Department. There were statements made by defendants as might tend toward showing guilt, but it is unnecessary to go into details.

Talbert testified that on the day previous to his arrest that night, he and his brother and son had planted corn until about noon; put some mules in a truck and took them to Flannery Station, where they met J. C. Johnson and some others. Later they went to various beer joints, from one to another, and finally wound up at Harm's place where they were arrested about eight o'clock. He said that he had not been in the William's store for several years, and denied that they were there that night. He said that he never saw the check in question until the police judge showed it to him; that he had nothing to do with it.

The testimony of Ed was the same as that of his brother. This was all the testimony for defendants, except by way of affidavit stating that Johnson would say if present as a witness, that on the day in question he was in company with the two defendants from about 2:00 to 8:00 or 9:00 p. m. at places named by them.

The check filed as an exhibit is written with pencil, so crudely constructed and badly written as to make it difficult to decipher the name of the maker or indorser, both apparently written by the same hand. The signature is either "Joseph B" or "James B. Sewell;" if it is the former (as counsel claims), appellant insists that there is a fatal variance, which we shall not undertake to determine since the judgment must be reversed, because of the fault appearing in the instructions.

It is uncertain from the proof of Mrs. Williams whether this was a case of obtaining money by false pretense, or a case of larceny or robbery. The latter may be true since Mrs. Williams, who was aware of many defects in the check, says she gave them the proceeds because of fear or annoyance. However that may be, the proof was below that necessary to show the falsity of the representation that the check had been signed by "James B. Sewell," and was not paid by the bank. There is no proof that James B. Sewell did not sign the check.

He was not introduced, if there were such a person; neither was the employee of the bank brought forward.

In order to make a case it was incumbent on the Commonwealth to show the falsity of the alleged representation. In discussing the necessity for convincing proof we said in Gordon v. Commonwealth, 146 Ky. 61, 141 S. W. 1186, 1187: ''To do this it was necessary to show that appellant did not have the money in the hands of the railroad, and that the order was not good. In this respect there was a failure of proof.'' In Burnley v. Commonwealth, 274 Ky. 18, 117 S. W. 2d 1008, we were passing on the sufficiency of an indictment, which charged that a check was presented and cashed upon the representation that it was a good check, and that the maker had sufficient funds in the bank and that it would be paid on presentation, but that the check had not been paid. This latter statement we held not sufficient to constitute an offense; there was no question of ''signature'' discussed. The Attorney General in brief agrees that the proof was insufficient.

The instruction given by the court covers almost three pages of typewriting, and is in one sentence, including that portion relating to the aiding or abetting of one defendant by the other. The instruction is so complicated as to create a doubt as to whether or not the members of the jury could unravel or understand it. Rand v. Commonwealth, 176 Ky. 343, 195 S. W. 802, and companion case.

The instruction is faulty in substance. In the first portion down to and including the words, ''and were false and untrue and were known to be false and untrue'' by defendants, we find this language (taken from the indictment) ''for the said pretended check was not a good check and was a bogus and forged check, and it was not signed by said James B. Sewell, and the bank would not pay it when presented, and James B. Sewell had nothing to do with it, etc.'' It seems to us that this portion of the instruction amounted to a conclusion by the court that the check was bogus, had been forged and Sewell had nothing to do with it, clearly matters for the jury under a proper instruction.

Again after telling the jury that Mrs. Williams would not have cashed the check had she known of the

falsity of the statements, the instruction reads: "All of said statements were made with the fraudulent intent to defraud Mrs. Williams and the Peoples State Bank & Trust Company, a banking corporation, etc., which refused to pay because the signature thereon was not that of James B. Sewell." The only comment on this portion of the instruction is, that the jurors no doubt concluded that there was no pertinent fact to be considered or decided by them.

On another trial the instruction should be in form such as a reasonably minded jury may be able to comprehend, and a proper form may be found in Stanley's Instructions to Juries under the subject "Obtaining money or property by false pretenses."

The judgment is reversed, and if upon another trial the proof is the same, or of no more legal effect than is here manifested, the court should direct an acquittal.

Judgment reversed.